**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

UNITED STATES OF AMERICA          :
                                  :
                                  :
                                  :          Case No. 2:10-cr-154
          v.                      :
                                  :
DANIELLE HALL,                    :
                                  :
              Defendant.          :

**Opinion and Order**:
**Defendant's Motion to Dismiss Indictment and Suppress Statements**

On December 16, 2010, a grand jury issued a two-count indictment charging Defendant Danielle Hall with corruptly influencing a federal grand jury investigation, under 18 U.S.C. § 1503, and knowingly and willfully making a false statement to federal law enforcement officers, under 18 U.S.C. § 1001(a)(2). Indictment, ECF No. 1.  On September 19, Hall filed a combined Motion to Dismiss the Indictment and Suppress Statements, ECF No. 31.  The Court held a hearing on October 20, 2011,  Mots. Hr'g Tr., ECF No. 37, and the parties filed supplemental briefing, Def.'s Supp'l Br. in Supp. of Mot. to Suppress, Nov. 21, 2011, ECF No. 38; Gov't's Supp'l Mem. in Opp'n to Def.'s Mot. to Suppress and Mot. to Dismiss Indictment, Dec. 6, 2011, ECF No. 39.

The Motion to Dismiss challenges the sufficiency of the indictment, arguing it fails to list essential elements of the

1

offenses charged and to describe their particulars to comport
with the Constitution's requirements.   The Motion to Suppress
argues two grounds for suppressing statements Hall made in
interviews with federal agents.   First, Hall contends the agents
were required to give her *Miranda* warnings but failed to issue
them.   Second, she maintains the statements she provided were not
voluntary, violating the Due Process Clause.

The Court finds the indictment lists the elements of the
offenses and the nature of Hall's conduct sufficiently to survive
a motion to dismiss and also finds no *Miranda* or Due Process
Clause violation requiring suppression of Hall's interview
statements.   Hall's motions are therefore **denied.**

## I. Background

A. <u>The Indictment</u>

The government charges that Hall, while working as a legal
assistant in the Burlington, Vermont U.S. Attorney's Office,
accessed and disclosed confidential information on government
cooperating witnesses in a drug investigation concerning her
then-boyfriend, Michael Ryan.   The grand jury returned an
indictment with two counts, the first a charge under 18 U.S.C. §
1503 for obstruction of justice, alleging Hall corruptly
influenced the grand jury investigation by giving confidential
information to Ryan.   Indictment 1.   The second charge was for
knowingly and willfully making a "false, fictitious, and
fraudulent statement and representation" about her conduct to

federal agents, under 18 U.S.C. § 1001(a)(2).  Indictment 2.

B. The April 17 and August 22, 2008 Interviews

The Motion to Suppress concerns statements Hall gave in two interviews with federal agents.  The first took place on April 17, 2008 at the Burlington U.S. Attorney's Office.  The day before, Hall was hospitalized for attempting suicide.  The Colchester, Vermont police department fielded a 911 call from Michael Ryan, who reported the suicide attempt.  Recognizing that Ryan was the target of a federal drug investigation, the Colchester police phoned Thomas Anderson, then the United States Attorney for Vermont, to inform him of the incident.  Hearing of the connection between Ryan and an employee in his office, Anderson reported the events to the Department of Justice in Washington, D.C., which in turn sent Special Agent Tom Hopkins of the Department's Office of the Inspector General to Burlington the next morning to investigate.[1]

On the morning of April 17, Anderson met with Agent Hopkins and DEA Special Agent Rick Carter, who was based in Burlington and working on the Ryan investigation, at the U.S. Attorney's Office.  Like Anderson, Agent Hopkins and Carter were aware of

---

[1]   The Office of the Inspector General performs audits on and conducts internal "criminal and administrative investigations" into abuses by Department of Justice employees. Mots. Hr'g Tr. 33-34.  *See also* Office of the Inspector General, Dep't of Justice, http://www.justice.gov/oig/ (last visited Dec. 13, 2011).

3

Hall's suicide attempt the previous day.  Hopkins hoped to speak
with Hall, should she come to work, to discover the nature of her
relationship with Ryan.  Around 9:00 am, Hall arrived at the
office and was brought by a staff member to a conference room
where Anderson met her.  Anderson introduced Hall to Hopkins, who
was inside the conference room, and told her that Hopkins "would
be interviewing her."  Tr. 13, 29-30.  Mr. Anderson did not tell
Hall that she was required to speak with Hopkins, threaten her
with the loss of her job if she did not, or tell Hall that he was
upset with her.  Anderson left and did not speak with or see Hall
again until after her interview was complete.  He testified that
he "was taking [his] lead from Special Agent Hopkins" as to how
to handle the situation.  Tr. 14, 30.

In the conference room, Agent Carter soon joined Hopkins,
who explained to Hall that the interview was voluntary and that
she did not have to consent to speak with them.  Hopkins told the
Court that, at the time, the investigation "was very nascent,"
and he had no plan, or grounds, to arrest Hall.  Tr. 38-39.
Hopkins produced OIG Form III 226.2, a standard waiver entitled
"Warnings And Assurances to Employee Requested to Provide
Information on a Voluntary Basis."  Gov't's Mem. in Opp'n to
Def.'s Mot. to Suppress and Mot. to Dismiss the Indictment Ex. 1,
Oct. 3, 2011, ECF No. 32-1.  They explained the form to Hall,
including reading it out loud, and asked her if she would agree

to sign it.  The form advised the defendant: that the agents were
interested in information concerning the "alleged misconduct,
including but not limited to, improper association"; that the
interview was voluntary; that Hall did "not have to answer
questions"; that "[n]o disciplinary action" would result from
refusing to submit to the interview; and that "any statement you
furnish may be used as evidence in any future criminal
proceedings or agency disciplinary proceeding, or both."  Gov't's
Mem. Ex. 1, Oct. 3, 2011.  Hall read the form herself and signed
it, Tr. 46-48, acknowledging:

> I understand the warnings and assurances stated above
> and I am willing to make a statement and answer
> questions.  No promises or threats have been made to me
> and no pressure or coercion of any kind has been used
> against me.

Gov't's Mem. Ex. 1.

The interview lasted approximately three hours.  Agent
Hopkins characterized it as uncontentious, although "probably
uncomfortable" for Hall.  Tr. 52.  He noted that she "was not
combative" and was "agreeable."  Tr. 52.  He said he and Agent
Carter were "deferential" and let her speak without contradicting
her account.  Tr. 96-97.  Hopkins explained he and Agent Carter
were mindful of Hall's recent suicide attempt and also did not
have any evidence to doubt her story.  The agents used no
restraints of any kind on Hall, and at no time informed her that
she was in custody.  They did not give a *Miranda* warning.  During

the interview, Hall admitted to having a romantic relationship with Ryan and to learning that he was under investigation by the DEA.  She said Ryan knew she worked for the U.S. Attorney's Office.  She admitted to accessing electronic files related to the Ryan investigation, but denied providing case-related information to Ryan or others.

In the latter half of the interview, Hopkins asked Hall if she would be willing to compose an affidavit to memorialize her statements.  When Hall agreed, Hopkins wrote a first draft in longhand based on his interview notes, pausing line-by-line to confirm what information Hall wanted in the document.  Hall suggested several changes and Hopkins made all of them.  He then gave Hall the draft and asked her to write her own onto an affidavit form and sign it herself.  Hopkins testified that this approach is standard practice to ensure neatness.  Hall wrote and signed the statement, and in it she acknowledged her voluntary consent to the interview and voluntary submission of the affidavit.  Gov't's Mem. Ex. 2, Oct. 3, 2011, ECF No. 32-2. Afterward, she met with Anderson and an administrative officer. Anderson instructed Hall to leave the office and informed her that he was placing her on administrative leave until at least the end of the week.  Hall turned in her keys and access cards and left the building.

On August 22, 2008, Agents Hopkins and Carter went to interview Hall a second time at a school within the Winooski, Vermont school district, her new place of employment.  Hopkins testified that the decision to meet Hall there, unannounced, was a strategic one.  He felt that her workplace would be a controlled and safe environment for the interviewers and that the element of surprise would reduce the chance that Hall could prepare a false story or speak to an attorney in advance.  As it was August, the agents encountered no students in the building, nor did they identify themselves or their business with Hall to staff.  Finding Hall, they asked her if they could talk.  They did not, at any point, provide her with *Miranda* warnings.  Although "[s]he didn't look very happy" to see them, she led them to an empty room adjacent to her office.  Tr 62.  They spoke for a maximum of five minutes while standing, Hall near the doorway.  Hall was "defensive" and "upset."  Tr. 63-64.  Hopkins acknowledged the interview was more combative than the first.

The agents did not restrain Hall or prevent her from leaving the room.  They did not arrest her or claim they had come to arrest her.  Hopkins told her they had additional evidence suggesting she lied to them in April, including proof that she had passed information to Ryan.  Hall again acknowledged accessing the files but denied disclosing them to Ryan or others. However, she admitted her memory of that period was imperfect

because she had been drinking a lot at the time.  Hall then said
she wanted to speak with a lawyer, and the agents informed her
that she could.  They immediately terminated the interview and
left the building.

## II. Motion to Dismiss

For an indictment to meet constitutional standards, it must
(1) contain the elements of the charged offense and sufficiently
inform the defendant of the pending charges and (3) be detailed
enough so that the defendant may plead double jeopardy in any
future prosecutions on a similar set of facts.  *Russell v. United
States*, 369 U.S. 749, 764-65 (1962).  It should be "a plain,
concise, and definite written statement of the essential facts
constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  It
need not do more than track the offense's statutory language and
state approximately the time and place of the criminal conduct.
*United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973).

A.  Count One: 18 U.S.C. § 1503

To convict a defendant for obstruction of justice under 18
U.S.C. § 1503, the government must prove:

    (1) that there is a pending judicial or grand jury
    proceeding constituting the administration of justice,
    (2) that the defendant knew or had notice of the
    proceeding, and
    (3) that the defendant acted with the wrongful intent
    or improper purpose to influence the judicial or grand
    jury proceeding, whether or not the defendant is
    successful in doing so.

*United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006).

Count One in the indictment essentially tracks these requirements.  It alleges the defendant "did corruptly influence . . . or endeavor to influence . . . a federal grand jury investigation of Michael Ryan."  Indictment 1.  Hall first argues the indictment's recitation omits element (2)'s knowledge or notice requirement and element (3)'s intent requirement. However, knowledge of the grand jury proceeding is implied by the indictment's accusation that Hall "corruptly . . . endeavor[ed] to influence" it.  *United States v. Monus*, 128 F.3d 376, 389 (6th Cir. 1997).  The element of wrongful intent is satisfied by the allegation that the defendant acted "corruptly," which requires the government to prove the defendant "'intended to impede the administration of that judicial proceeding.'"  *Quattrone*, 441 F.3d at 170 (quoting *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003)).

In addition, Hall challenges Count One's statement of the particular details of her allegedly criminal conduct.  Hall claims the indictment should have listed precisely the information she is accused of providing to Ryan.  She asserts such detail is necessary for double jeopardy purposes and to ensure a unanimous jury verdict.  An indictment must "state some fact specific enough to describe a particular criminal act, rather than [just] a type of crime."  *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000).  As noted previously, however, the

9

approximate date, time and place of the criminal act are normally sufficient. *Salazar*, 485 F.2d at 1277.  In an 18 U.S.C. § 1503 indictment, the government need not go further and detail the information the defendant allegedly provided.  *United States v. Wood*, 958 F.2d 963, 976 (10th Cir. 1992) ("It is simply asking too much of the indictment to require an allegation of the particular statements the government intended to prove were false in a § 1503 prosecution."); *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989); *United States v. Schwimmer*, 649 F.Supp. 544, 547-48 (E.D.N.Y. 1986); *Cf. United States v. Abrams*, 539 F. Supp. 378, 384-86, 386 n.3 (S.D.N.Y. 1982) (dismissing a § 1503 count alleging grand jury witness intimidation when the indictment gave a twenty-month window in which the violations took place, did not specify the matter the grand jury was investigating, and provided an indeterminate location: "in the Southern District of New York or elsewhere.") (internal quotation omitted).

Here, the indictment gives the approximate date range of the offense-"in or about February 2008 through in or about March 2008"-and the place-"in the State and District of Vermont." Indictment 1.  It also specifies that Hall impeded "a federal grand jury investigation" by disclosing information concerning the investigation to one of the grand jury's targets, Michael

10

Ryan.  Indictment 1.  The indictment therefore specifies all that is required under the Constitution.

On the specific double jeopardy concern, the government conceded it could not retry Hall based on any information she provided to Ryan not raised in her first trial.  Gov't's Supp'l Mem. 3, Dec. 6, 2011.  Furthermore, Hall's counsel admitted that any confusion of the issues before the jury could be remedied by appropriate jury instructions or a special verdict.  Tr. 119.  Finally, concise indictments that fulfill the constitutional minimum requirements may be further clarified by evidence provided to the defense in pre-trial discovery or a Bill of Particulars.  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).  At the hearing, the government explained it had turned over to Hall proffer sessions with Ryan in which Ryan indicated the names of three witnesses Hall allegedly revealed to him.  Tr. 115-118.  The government concedes that its case on Count One is limited to the disclosure of the names of those three witnesses.  Tr. 118.  Hall's counsel did not object to the quality or completeness of that discovery at the hearing, or raise further double jeopardy concerns in Hall's supplemental briefing.  The Court finds that charge survives scrutiny.

B.  Count Two: 18 U.S.C. § 1001(a)(2)

18 U.S.C. § 1001(a)(2) imposes criminal penalties on those who:

11

> in any matter within the jurisdiction of the executive,
> legislative, or judicial branch of the Government of
> the United States, knowingly and willfully . . . make[]
> any materially false, fictitious, or fraudulent
> statement or representation . . . .

The parties agree that to sustain a charge under the law, the
government must show at least that the defendant: (1) knowingly
and willfully, (2) made a false statement, (3) within the
jurisdiction of an agency of the United States, and (4) the
statement was material. *See United States v. Ballistrea*, 101
F.3d 827, 834 (2d Cir. 1996). The indictment specifies that Hall
"did, in a matter within the jurisdiction of the United States
Department of Justice, Office of the Inspector General . . .
knowingly and willfully make a materially false, fictitious, and
fraudulent statement and representation to an officer of the
United States." Indictment 2. It then describes Hall's alleged
statement. Indictment 2. It thus addresses each of the agreed-
upon listed elements of the offense nearly verbatim.

Hall asserts the indictment is flawed in failing to list
"specific intent to mislead," *United States v. McCarrick*, 294
F.3d 1286, 1290 (11th Cir. 2002), which she contends is the
mental state the government must prove concerning the making of
the statement. The government, in response, adopts the reasoning
of cases holding that specific intent is not required to
transgress the statute's jurisdictional prong (element (3) in the
list above). *See* 18 U.S.C. § 1001(a); *see also United States v.*

12

*Yermian*, 468 U.S. 63, 72-73 (1984); *United States v. Bakhtiari*, 913 F.2d 1053, 1061 (2d Cir. 1990).  The jurisdictional element is not disputed in this case, and, in examining the text of the statute, comes before "knowingly and willfully," which modifies the rest of the offense's provisions.  *See* 18 U.S.C. § 1001(a).  The government cites language in *Yermian* and *Bakhtiari* for the proposition that specific intent to mislead is not a required component of the defendant's making of the statement.  *See Yermian*, 468 U.S. at 73 ("Noticeably lacking from this enactment is any requirement that the prohibited conduct be undertaken with specific intent to deceive the Federal Government, or with actual knowledge that false statements were made in a matter within federal agency jurisdiction."); *Bakhtiari*, 913 F.2d at 1061 (quoting same).

However, the Second Circuit has not squarely ruled on whether 18 U.S.C. § 1001(a)(2) requires showing an element of specific intent outside the jurisdictional prong.  Nationally, the circuits are divided.  The First, Third, Fourth, Seventh, Eighth and Tenth (in an unpublished disposition) all read *Yermian* to hold that proof of specific intent to deceive is not a required element of the offense.  *United States v. Gonsalves,* 435 F.3d 64, 72 (1st Cir. 2006); *United States v. Leo*, 941 F.2d 181, 200 (3d Cir. 1991); *United States v. Sparks*, 67 F.3d 1145, 1152 (4th Cir. 1995); *United States v. Ranum,* 96 F.3d 1020, 1028-

29 (7th Cir. 1996);[2] *United States v. Hildebrandt*, 961 F.2d 116, 118-19 (8th Cir. 1992); *United States v. Russo*, No. 98-3245, 2000 WL 14298, at *5 (10th Cir. Jan 10, 2000).

On the other hand, post-*Yermian*, the Fifth, Sixth, Ninth and Eleventh Circuits all hold that proof of some level of specific intent is in fact part of the burden carried by the government at trial.  *See United States v. Puente*, 982 F.2d 156, 159 (5th Cir. 1993) (but also holding that proof of reckless indifference to the truth is sufficient to satisfy the scienter requirement); *United States v. Geisen*, 612 F.3d 471, 487 (6th Cir. 2010) (requiring proof of intent to deceive);[3] *United States v. Camper*, 384 F.3d 1073, 1075 (9th Cir. 2004)(requiring proof of

---

[2]     The Seventh Circuit in *Ranum* noted that its view of § 1001 was not binding since the court was merely developing it to apply to an analogous statute, 18 U.S.C. § 1097(a).  96 F.3d at 1029.  In a later unpublished decision, the Seventh Circuit cited *Ranum* in noting that "[p]ersonal knowledge of the false information satisfies the *mens rea* requirement" of § 1001. *United States v. Cunningham*, 1998 WL 385460, at *4 (7th Cir. June 25, 1998).

[3]     The government cites to *United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010), decided only months before *Geisen*. *Algee*, unlike *Geisen*, does not list specific intent in its description of the elements of the offense.  However, that omission may have been an oversight.  The court in *Algee* was only concerned with whether the government had adequately proven that the defendant knew his statements were false, and thus did not need to reach the issue of specific intent.  Moreover, it cited for its recitation of the crime's elements *United States v. Brown*, 151 F.3d 476, 484 (6th Cir. 1998), a case that relied on the Fifth Circuit rule and did note a specific intent requirement.  *Algee*, 599 F.3d at 512.

14

specific intent);[4] *McCarrick*, 294 F.3d at 1290 (requiring proof of specific intent to mislead).

Within the Second Circuit, no district court appears to have joined the debate over whether proof of specific intent is required in making the offending statement.  Several courts, including this one, have not mentioned specific intent in listing the elements of the offense.  *See, e.g.*, *United States v. Barrett*, 639 F. Supp. 1342, 1347 (D. Vt. 1986); *United States v. Occhipinti*, 772 F. Supp. 170, 177 (S.D.N.Y. 1991); *United States v. Subeh*, No. 04-cr-6077 CJS, 2006 WL 3407891, at *2 (W.D.N.Y. Nov. 27, 2006).

Others have sought the counsel of Judge Leonard Sand et al.'s, *Modern Federal Jury Instructions* in resolving questions as to what § 1001(a)(2) requires.  *See, e.g.*, *United States v. Bin Laden*, 146 F. Supp. 2d 373, 377 (S.D.N.Y. 2001); *United States v. Perlmutter*, 656 F. Supp. 782, 792 (S.D.N.Y. 1987).  In the face of ambiguous authority, this Court also looks to the present edition of Judge Sand's work.  2 L. Sand, et al., Modern Federal Jury Instructions-Criminal, Instr. 36-12, at 36-33 (2011).  It divides the three types of statements-"false, fictitious, or

---

[4]    The Ninth Circuit did not require proof of specific intent in an unpublished decision cited by the government, *United States v. Jacobs*, 212 F. App'x. 683, 684 (9th Cir. 2006), but any doubt as to the element's vitality in that circuit appears removed by *United States v. Selby*, 557 F.3d 968, 977 (9th Cir. 2009), a more recent published decision that cites to *Camper* and includes specific intent.

fraudulent"-covered by 18 U.S.C. § 1001(a)(2) into two
categories. *Id.* A statement is false or fictitious if "untrue
when made, and known at the time to be untrue by the person
making it." *Id.* Whereas a statement is "fraudulent" if "untrue
when made and was made or caused to be made with intent to
deceive the government agency to which it was submitted." *Id.*
Proof of intent to deceive is thus only necessary when the
government alleges the statement was fraudulent and not when it
charges it was merely false or fictitious.

This interpretation comports with the well-understood
meaning of "fraud." When interpreting statutes involving "terms
that have accumulated settled meaning under the common law a
court must infer, unless the statute otherwise dictates, that
Congress means to incorporate the established meaning of these
terms." *Neder v. United States*, 527 U.S. 1, 21-22 (1999)
(internal citations and punctuation omitted) (construing
"defraud" under the mail, wire, and bank fraud statutes). Fraud,
"as commonly understood among both lawyers and laypersons," is
"conduct or speech *intended to mislead* the putative victim into
parting with money or property." *United States v. Klein*, 476
F.3d 111, 113 (2d Cir. 2007) (emphasis added). In so
differentiating between the statutory terms, it also gives false,
fictitious, and fraudulent each greater independent meaning than
if they shared a single *mens rea* requirement. *See Babbitt v.*

16

*Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 697-98 (1995).

Here, Count Two's heading reads: "False Statement." Indictment 2.  However, the text of the Count alleges Hall's statements were of all three varieties, deviating from the statute's use of the conjunction "or," 18 U.S.C. § 1001(a)(2), by claiming they were "false, fictitious, *and* fraudulent." Indictment 2 (emphasis added).  As a result, the government's burden of proof at trial must encompass the specific intent to deceive required for fraudulent statements.  This may not be what the government had in mind when drafting the indictment, but it does not require granting Hall's motion to dismiss.  Since, as noted, "intent[] to mislead" is a part of the commonly understood meaning of the word "fraud" itself, the government need not specifically mention the words "specific intent" in the indictment for it to be valid.  *Klein*, 476 F.3d at 113 (finding an indictment's bank fraud counts sufficient even though they did not specifically allege that the fraudulent act was "material," since materiality is an element of the offense that can be inferred from the use of the word "fraud" itself in the indictment and the statute does not use the word "material"); *see United States v. Resendiz-Ponce*, 549 U.S. 102, 107-08 (2007). Since, by using the word "fraudulent," Count Two encompasses all elements the government must prove at trial as it stands, it is

17

not defective.  The court denies the motion to dismiss as to both counts.

### III. Motion to Suppress Statements

Hall also filed a motion to suppress her interview statements.  As grounds to suppress, she argues first that both interviews were custodial interrogations not preceded by *Miranda* warnings.  Additionally, Hall contends that her statements were products of coercive interview conditions, violating the Due Process Clause.

A. Whether Hall was Entitled to *Miranda* Warnings

The central issue in Hall's *Miranda* claim is whether the interviews were custodial, as the government does not dispute the sessions were "interrogations."  Gov't Mem. 13, Oct. 3, 2011. To determine whether a suspect is in custody for *Miranda* purposes, courts look to the "circumstances surrounding the interrogation" to assess whether a reasonable person in the same circumstances would "have felt that he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  The court's "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).  In conducting that analysis, the court examines factors such as the length and

18

location of the interrogation, *Tankleff v. Senskowski*, 135 F.3d
235, 244 (2d Cir. 1988), the use of restraints, *New York v.
Quarles*, 467 U.S. 649, 655 (1984), and statements made by the
interviewing officers regarding whether or not the person is
under arrest, *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir.
2003).  The officer's or the defendant's unexpressed views of the
situation do not impact the analysis.  *Stansbury v. California*,
511 U.S. 318, 323-25 (1994).

    The Court disagrees with Hall's view that she was in custody
at the time of the interviews, as neither approached the level of
an arrest.  Both occurred at her places of employment, without
restraints.  She was never subject to threats that she must
participate.  In the first meeting, Mr. Anderson was only present
briefly and did not pressure Hall to speak with Agent Hopkins.
Hopkins, for his part, conveyed to her several times, both
verbally and by giving her the written waiver form, that the
interview was voluntary and that she had the option not to
cooperate and experience no employment penalty.  She acknowledged
her consensual participation by signing the waiver.  While the
interview was lengthy, the agents largely deferred to Hall and
allowed her to do most of the talking.  They asked for her
permission before helping her compose a statement.  The second
interview lasted only several minutes, and while it was more
antagonistic than the first, the agents withdrew as soon as Hall

asked to speak with a lawyer.  They allowed Hall to choose where to speak, an empty office, did not sit down or ask her to sit down, and they did not present themselves as law enforcement officers to others in the building.  Given those circumstances, no reasonable person would believe she was in custody during either interview.  As a result, *Miranda* did not attach, the agents did not have to give Hall *Miranda* warnings before beginning their meetings with her, and the Court cannot suppress her statements under that rationale.

B. <u>Whether Hall's Admissions were Involuntary</u>

Hall also argues that her statements to the agents were involuntary and should be suppressed by reason of the Due Process Clause.  The government bears the burden of showing by a preponderance of the evidence that, in accord with the Due Process Clause, a "suspect['s] . . . confession is truly the product of free choice."  *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).  In determining whether a confession is voluntary, the court must examine "all of the circumstances surrounding the interrogation to see if police overreaching overcame a suspect's will."  *Weaver v. Brenner*, 40 F.3d 527, 536 (2d Cir. 1994).  Among the circumstances the court should consider are "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials."  *Anderson*, 929 F.2d at 99.  Of paramount concern is the final

factor, the conduct of the investigating officers, as "coercive police activity" that is causally linked to the confession is a necessary ingredient in a voluntariness challenge. *Colorado v. Connelly*, 479 U.S. 157, 164, 167 (1986). While the Due Process Clause forbids confessions induced against suspect's free will, it "'does not protect against hard choices.'" *United States v. Roberts*, 660 F.3d 149, 157 (2d Cir. 2011) (quoting *United States v. Solomon*, 509 F.2d 863, 872 (2d Cir. 1975)).

The government has sustained its burden in demonstrating that, under the totality of the circumstances, Hall voluntarily supplied the agents with information. Beginning with her personal characteristics, Hall is an adult who worked as a legal assistant at the U.S. Attorney's Office and in the Winooski School District. The record provides no basis to believe that she generally could not rationally choose to speak with the agents or assess what information to divulge to them. Indeed, Hall decided to end the second interview, minutes after it began, to seek the advice of counsel.

It is true that the first interview took place only one day after Hall was released from the hospital for attempting suicide. That provokes the question of whether she was particularly susceptible to coercion that day. The court must assess "the possibly vulnerable subjective state of the person who consents." *United States v. Medico*, 557 F.2d 309, 312 (2d Cir. 1977) (citing

21

*Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973)) (dealing with the requirements for voluntary consent to a warrantless search under the Fourth and Fourteenth Amendments); *United States v. Silva*, 418 F.2d 328, 330 (2d Cir. 1969).

There is no evidence Hall's faculties were diminished when she arrived at work and spoke with the agents. *See United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (finding the confession offered by a suicidal defendant who also claimed to hear voices was voluntarily given). Indeed, the mere fact that Hall went to work provides some indication that she was not significantly impaired. While she had been in the hospital the day before, there is no evidence that she was on medication or in physical pain such that it would constrain her ability to exercise her free will. *Cf. Campaneria v. Reid*, 891 F.2d 1014, 1019-20 (2d Cir. 1989) (finding defendant's statements were voluntary even though he was questioned while in the ICU, in pain and attached to tubes, because he was alert and the interrogators suspended the interview when he requested). During the interview itself, Hopkins testified that Hall was calm, agreeable, and cooperative. Hall read and signed the waiver form, after repeated explanation, and submitted an affidavit in which she noted she was answering the agents' questions voluntarily.

Secondly, the conditions of the interrogations do not suggest Hall was pressured to the level of being coerced to speak

22

with the agents against her will.  Both took place in conference
rooms at her places of work.  In neither was Hall physically
restrained, and in both she was informed she was free to leave.
While Hall did not have a lawyer present–and it does not appear
she was informed she could ask for the advice of counsel in the
first interview–neither interrogation implicated *Miranda*, as
found above.  Moreover, during the second interview, the agents
did inform Hall she could seek an attorney's advice if she liked,
and they agreed to terminate the interview when she asked.

Finally, the officers involved did not engage in misconduct
overbearing Hall's free will.  In this regard, Hall makes two
claims.  She first notes that Agents Hopkins and Carter, as well
as Mr. Anderson, knew of the recent suicide attempt before
meeting with her.  She maintains that the officials' decision to
nonetheless conduct the interview violated a standard of "special
care" owed to defendants known to their interrogators to be
mentally impaired, as described in *United States v. Hall*, 93 F.3d
1337, 1346 (7th Cir. 1996).  But as the Court discussed above,
Hall did not present to the interviewers as distressed and the
record does not show that Hall was mentally impaired in any way
relevant to exercising her free will to participate in the
interview.

Furthermore, no matter the suspect's level of impairment,
"some significantly probative evidence of coercion is required."

*United States v. Hughes*, 640 F.3d 428, 439 (1st Cir. 2011)
(admitting a confession as voluntarily given when the officers
knew in advance of the defendant's suicidal ideation and that he
posed a threat to himself if left alone, but were unaware that he
was susceptible to panic attacks until he suffered one during the
interview, prior to confessing).  Otherwise, the defendant's
mental state cannot support a finding of involuntariness.
*Connelly*, 479 U.S. at 164.

The Court does not detect coercion on the part of the
officers as it pertains to Hall's condition at the time.  Agent
Hopkins took the precaution of explaining to Hall several times
and in different ways that she was not obligated to meet with
him.  When she agreed to the interview, Hopkins stated he and
Carter largely allowed Hall to direct the discussion, and did not
challenge her account.  Hall does not describe how, other than by
postponing the interview or inquiring after her well-being, the
interviewers could have been more sensitive to her condition
while resolving their suspicions about her connection to a target
of an active criminal investigation.  After all, Hall was
arriving at work where she might have access to information
concerning Ryan's case.  The Court does not aim to minimize the
troubling implications of interviewing suspects in Hall's state,
but here the record shows Hall's "will [was not] overborne and

[her] capacity for self-determination [was not] critically impaired." *Schneckloth*, 412 U.S. at 225-26.

Second, Hall argues she felt compelled to participate in the April interview because she feared that she would lose her job at the U.S. Attorney's Office otherwise.  Similarly, she contends she felt pressured to speak with the agents in August 2008, because they had the power to reveal their investigation to her new employer.  When a suspect's refusal to testify would jeopardize her job, it raises sharp Due Process Clause concerns. *Garrity v. New Jersey*, 385 U.S. 493, 497-98 (1967).  Law enforcement is not permitted to "compel statements through threat of 'economic or other sanctions capable of forcing the self-incrimination which the [Fifth] Amendment forbids.'" *Roberts*, 660 F.3d at 156 (quoting *Minnesota v. Murphy*, 465 U.S. 420, 434 (1984)).  However, a statement given under such conditions is involuntary only if the pressure on the suspect was "of sufficiently appreciable size and substance to deprive the accused of his 'free choice to admit, to deny, or to refuse to answer.'"  *United States* ex rel. *Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974) (quoting *Garrity*, 385 U.S. at 496).  The mere presence of a coercive employment consequence is not sufficient to find a Due Process Clause violation when "other evidence or common sense suggests that the statement at issue in

fact was voluntary." *United States v. Stein*, 440 F. Supp. 2d
315, 329 (S.D.N.Y. 2006).

Here, the evidence does not indicate that Hall was under
threat of losing her job for refusing to speak with the agents.
Mr. Anderson made no such threat and spent only a minimal amount
of time with Hall and Agent Hopkins.  The Court disagrees with
Hall that Anderson's remark that Agent Hopkins "would be
interviewing her,"  Tr. 13, 29-30, was a "direct order to submit
to an interview,"  Def.'s Supp'l Br. 7-8.  The statement came as
Anderson was briefly introducing Hall to the agent.  Anderson
testified that, at that point, he "was taking [his] lead from
Special Agent Hopkins."  Tr. 14, 30.  It is more likely that the
sense conveyed by Anderson's comment was merely that Hopkins, not
Anderson, would be speaking with Hall from that point forward.
The comment did not appear calculated to steer Hall's choice in
whether to provide information to Hopkins.  Moreover, when
Hopkins did speak with her, he carefully ensured Hall understood
she was under no obligation to meet with him and Agent Cater and
that she would not risk losing her job if she declined to talk.

In addition, during the first interview, Hall signed the
waiver and acknowledged in her affidavit that she was speaking
with law enforcement voluntarily.  There is no evidence that the
agents forced her to respond to their questions or to draft a

statement.  The Court cannot find those conditions amount to official coercion to participate in the interview.

Nor did the surprise meeting at Hall's Winooski school district office throw her job status into question.  The mere fact that the agents chose Hall's workplace for the interview does not support a finding of coercion; in fact, it can lend weight to the opposite view.  *United States v. Bienvenue*, 632 F.2d 910, 913 (1st Cir. 1980) (finding statements voluntary, relying in part on the fact that the questioning occurred in the "familiar surroundings" of the station where the defendant police officer worked).  In fact, Agents Hopkins and Carter minimized the potential for work-related consequences by visiting during summer vacation when Hall's school building office was largely empty of students and other staff.  Moreover, Agent Hopkins made sure not to divulge his title or the purpose of his visit to anyone else at the school.  The interview took place in an empty room and lasted only about five minutes.  Finally, when Hall determined she no longer wished to talk with them, the agents halted their questioning and left.

Certainly, as Hopkins admitted, the timing and location of the interview were no accident.  The agents believed meeting Hall at her workplace unannounced would help ensure a controlled, safe, and honest interaction with her, as well as make it more likely she would speak with them rather than object or first seek

27

legal counsel.  But making Hall's choice whether to speak with law enforcement more difficult, in the measured manner used here, is not improper.  *See Roberts*, 660 F.3d at 157.  Rather than committing misconduct to secure a confession, the agents took significant steps to ensure that Hall would only give them free and considered responses.  In light of the totality of the circumstances surrounding the two interviews, the Court finds Hall's Due Process Clause rights were not violated.

The Court therefore denies both the motions to dismiss the indictment and to suppress statements.

Dated at Burlington, in the District of Vermont, this 15th day of December, 2011.

/s/William K. Sessions III
William K. Sessions III
U.S. District Court Judge